IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HENRY GONZALES and TIM DESCHAMPS,

      Plaintiffs,

      v.                                 Case No.: 1:22-cv-0525-WJ-SCY

NEW MEXICO DEPARTMENT OF HEALTH dba NEW
MEXICO BEHAVIORAL HEALTH INSTITUTE,
a state government agency, and SUSIE ARCHULETA,
Longterm Care Director, JEREMY GONZALES, Activity
Director, RICHARD VIGIL, Human Resources Director,
H. C. HAWKINS, Deputy Hospital Administrator, ALBERTA
LUCERO, Admissions Director, and KIMBERLY VILLANUEVA,
FMLA Administrator, each in their individual capacities,

      Defendants.

## SECOND AMENDED COMPLAINT FOR DAMAGES

      **COMES NOW THE PLAINTIFFS AND STATE** that this amendment is by right

pursuant the Initial Scheduling Order of the Court.  Further, this is an action for a Section 1983

violation for deprivations of protected property interests in public employment without due

process, for violations of the First Amendment right to petition the government for redress of

grievances, for a violation of the equal protection clause of the Fourteenth Amendment of the

United States Constitution, for disability discrimination pursuant Title VII and the New Mexico

Human Rights Act, for breach of contract, and FMLA interference and retaliation, and for other

statutory retaliation claims under the Whistleblower's Protection Act.  The Plaintiffs have

followed all administrative procedures for bringing these claims.  This Court has jurisdiction and

venue regarding all claims and all parties named in this action.  The Plaintiff states as follows:

      1.      Plaintiff Henry Gonzales (hereinafter "Gonzales") is an individual male who is

also disabled, handicapped and/or has a serious medical condition and/or is regarded as disabled, handicapped and having a serious medical condition by Defendants, and who at all times relevant herein was a resident of the State of New Mexico, living in Las Vegas, New Mexico and employed and working under contract for the Defendant New Mexico Department of Health dba New Mexico Behavioral Health Institute (hereinafter "DOH").  At the time of his wrongful termination, Plaintiff Gonzales was working in the Tesuque Unit as a Psychiatric Technician-Advanced ("Psych Tech") though six months before and for the previous prior five years he was a Psychiatric Technician Supervisor, and never received notice of the demotion.  Plaintiff Gonzales has two claims requiring administrative exhaustion to proceed in this Court – his New Mexico Human Rights Act claim and his similar Title VII of the Civil Rights Act of 1964 Claim.  Plaintiff Gonzales timely filed a New Mexico Human Rights Act Charge (which suffices for both statutes pursuant the work-sharing agreement between the New Mexico Human Rights Bureau ("NMHRB") and the Equal Employment Opportunity Commission.  The Charge process has completed, and the NMHRB has issued Plaintiff Gonzales a NMHRB Notice of Non-Determination showing administrative exhaustion.  The Charge (omitting its extensive exhibits) and Notice of Non-Determination are attached hereto and included herein by reference as **Complaint Exhibit A**.  Plaintiff Gonzales Right to Sue Letter from the EEOC has not been issued to Plaintiff yet, and will be attached by further amendment when it arrives.

       2.      Plaintiff Tim Deschamps (hereinafter "Deschamps") is an individual male who at all times relevant herein was a resident of the State of New Mexico, living in Las Vegas, New Mexico and employed and working under contract for the Defendant New Mexico Department

of Health dba New Mexico Behavioral Health Institute (when referred to separately from the DOH, hereinafter "NMBHI").  At the time of his wrongful termination, Plaintiff Deschamps was working in the Juniper One Unit as a Recreational Therapist Operational.

3.     The Defendant New Mexico Department of Health dba New Mexico Behavioral Health Institute is an agency of the State of New Mexico with its principal places of business in the Counties of San Miguel, Santa Fe, and Bernalillo within the State of New Mexico.  DOH employs over 20 employees, and engages in business within, throughout and beyond the boundaries of the State of New Mexico. DOH is an independent government agency.  DOH is the public health authority within state boundaries, and operates New Mexico Behavioral Health Institute pursuant those duties, housing and caring for at least 100 differently-abled individuals, and admitting 1000 patients a year with mental, emotional, psychological and medical conditions.

4.     Plaintiff Gonzales is informed and believes, and based thereon alleges, that Defendant H.C. Hawkins (hereinafter "*Hawkins*") is an individual who at all times relevant herein was a resident of the County of San Miguel, State of New Mexico, and employed by DOH as the Deputy Hospital Administrator for NMBHI, and previously was the Human Resources Director for NMBHI.  At all times relevant herein, Defendant Hawkins was the Deputy Hospital Adminstrator of NMBHI and thus, was a primary senior supervisory employee and/or agent of DOH related to Plaintiff Gonzales's DOH employment.  Mr. Hawkins signed Plaintiff Gonzales February 23, 2021 Notice of Final Action – Dismissal for DOH and NMBHI.

5.     Plaintiff Gonzales is informed and believes, and based thereon alleges, that

3

Defendant Alberta Lucero (hereinafter "*Lucero*") is an individual who at all times relevant herein was a resident of the County of San Miguel, State of New Mexico, and employed by DOH as the Nurse Manager of the Admissions Unit for NMBHI.  At all times relevant herein, Defendant Lucero was the Nurse Manager of the Admissions Unit for NMBHI and thus, was a primary senior supervisory employee and/or agent of DOH related to Plaintiff Gonzales's DOH employment.  Ms. Lucero signed Plaintiff Gonzales February 23, 2021 Notice of Final Action – Dismissal for DOH and NMBHI.

6.    Plaintiff Gonzales is informed and believes, and based thereon alleges, that Defendant Kimberly Villanueva (hereinafter "*Villanueva*") is an individual who at all times relevant herein was a resident of the County of San Miguel, State of New Mexico, and employed by DOH as the Human Resources FMLA Administrator for NMBHI.  At all times relevant herein, Defendant Villanueva was the Human Resources FMLA Administrator of NMBHI and thus, was a primary staff supervisory employee and/or agent of DOH related to Plaintiff Gonzales's DOH employment, and particular in charge of his use of Family Medical Leave, and responsible for DOH's on-going responsibility to keep Plaintiff Gonzales informed of his FMLA rights.  When Plaintiff refers to the "Gonzales Defendants" herein, Plaintiff refers to DOH doing business as NMBHI, and Individual Defendants Hawkins, Lucero and Villanueva.  When Plaintiff refers to the "Gonzales Individual Defendants" herein, Plaintiff refers to Individual Defendants Hawkins, Lucero and Villanueva.

7.    Plaintiff Deschamps is informed and believes, and based thereon alleges, that Defendant Susie Archuleta (hereinafter "*Archuleta*") is an individual who at all times relevant

herein was a resident of the County of San Miguel, State of New Mexico, and employed by DOH as the Longterm Care Director for NMBHI.  At all times relevant herein, Defendant Archuleta was the Longterm Care Director of NMBHI and thus, was the primary supervisory employee and/or agent of DOH related to Plaintiff Deschamps' DOH employment.  Ms. Archuleta signed Plaintiff Deschamps February 3, 2020 Notice of Final Action – Dismissal for DOH and NMBHI.

8.     Plaintiff Deschamps is informed and believes, and based thereon alleges, that Defendant Jeremy Gonzales (hereinafter "*Gonzales*") is an individual who at all times relevant herein was a resident of the County of San Miguel, State of New Mexico, and employed by DOH as the Activities Director for NMBHI.  At all times relevant herein, Defendant Gonzales was the Activities Director of NMBHI and thus, was the primary supervisory employee and/or agent of DOH related to Plaintiff Deschamps' DOH employment.  Defendant Gonzales was Plaintiff Deschamps' direct supervisor, and was successfully sent the Response to Contemplated Termination by email by the undersigned on January 17, 2020.  Mr. Gonzales signed Plaintiff Deschamps' February 3, 2020 "Notice of Final Action – Dismissal" for DOH and NMBHI.

9.     Plaintiff Deschamps is informed and believes, and based thereon alleges, that Defendant Richard Vigil (hereinafter "*Vigil*") is an individual who at all times relevant herein was a resident of the County of San Miguel, State of New Mexico, and employed by DOH as the Human Resources Director for NMBHI.  At all times relevant herein, Defendant Vigil was the Human Resources Director of NMBHI and thus, was a primary staff supervisory employee and/or agent of DOH related to Plaintiff Deschamps' DOH employment.  Defendant Vigil was the stated contact person in Plaintiff Deschamps' January 7, 2020 "Notice of Contemplated

Action – Termination," and was successfully sent the Response by email by the undersigned on January 17, 2020.  When Plaintiff refers to the "Deschamps Defendants" herein, Plaintiff refers to DOH doing business as NMBHI, and Individual Defendants Archuleta, Gonzales and Vigil. When Plaintiff refers to the "Deschamps Individual Defendants" herein, Plaintiff refers to Individual Defendants Archuleta, Gonzales and Vigil.

10.     Whenever in this complaint reference is made to "Defendants, and each of them," such allegation shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.  The Court has subject-matter and personal jurisdiction over all parties and claims, and venue is appropriate in the Fourth Judicial District, the home of NMBHI.

11.     Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein (unless explicitly stated otherwise), each of the Defendants was the agent, servant and employee, co-venturer and co-conspirator of the other Defendants, and was at all times herein mentioned, acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of such agency, employment, joint venture, and conspiracy. Furthermore, upon information and belief, at all times relevant to this Complaint all Defendants had actual and/or constructive notice of a pattern of disability discrimination and otherwise improper supervisory behavior on the part of Defendants throughout their long careers as DOH supervisory employees.  All defendants implicitly approved of that behavior by refusing to act to terminate, educate or otherwise discipline the other defendants.

12.     The basis for pleading and eventually trying Mr. Gonzales' and Mr. Deschamps' claims together is that DOH's terminations of both employees, arise out of the same dangerous

condition, maintained by Defendant DOH for at least the last five years at its NMBHI facility –
the dangerous condition of habitually overworking all patient attendants (typically the Psych
Tech position) to the limits of physical capacity and beyond the limits of legal capacity, often
resulting in hourly work totals of 60 hours or more during a normal work week.  Mr. Deschamps,
beyond remarking to his supervisors of the lack of patient care over his 15 years with NMBHI,
initially complained on December 3, 2019 during the investigation of the November 23, 2019
choking death of Defendant DOH's patient, regarding this pattern or practice of the facility, as
noted in the Notice of Contemplated Action that "Resident X had been on a level for a couple of
months and had been taken off.  However you [Mr. Deschamps] believed Resident X should
have been on a level, especially after the previous choking incident where RN Lynn Padilla
brought Resident X back."

13.    "On a level" is Institute-speak for what Mr. Deschamps understands as round-the-
clock supervision due to the patient's inability to regulate their emotional state, perceive the
consequences of their actions, and protect themselves from imminent harm – sometimes, as here,
the imminent harm that a bag of Vanilla Wafers or thrown-away burrito can present to a post-
stroke, emotionally and mentally impaired patient.  The practice or procedure is referred to as
well as Level One, Level Two and Level Three, meaning that either one attendant personally
observes the patient 24 hours a day, two attendants personally observe the patient 24 hours a day,
or three attendants personally observe the patient 24 hours a day.

14.    Mr. Deschamps' January 17, 2020 Response to Notice of Contemplated Action stated
directly the practice and pattern which he was complaining of had a root cause:

Mr. Deschamps says the Facility is in the middle of a person-power crisis – that the Facility at its operational level (meaning the techs) is critically understaffed, and that the techs are routinely called upon to work 16 hour shifts, sometimes more than 60 hours a week.  This is critically important here because the situation has been of such duration that the Facility has probably entered the downward spiral pattern associated with such long-term crises.  Because of problems with management (illustrated definitively by Mr. Deschamps' NCA), the Facility has problems staying staffed enough to provide all of its very necessary services to its patients.  Therefore, the Facility both overworks and overpays staff because of the resulting over-time wages.  Therefore, services deteriorate further because a previously-sufficient labor budget no longer suffices, the staff is overtired, and "non-essential" services are withdrawn.  And finally, if you are running a psychiatric hospital, a patient ends up dead.  Because many psychiatric patients, like [the deceased patient], present issues absolutely necessitating otherwise unusual personal supervision demands.

>     >     >

Mr. Deschamps believes there are other Institute patients who are currently being improperly supervised, and should be on a Level I, just like [the deceased patient]. [Patient CL] is on a puree diet he believes due to a stroke. He is well aware of all that goes on. He knows he is not supposed to eat solid foods but if he can get a hold of anything that is not puree he will eat it. [Patient AL] has seizures, wears a helmet while in his wheelchair, and if he can get a hold of any drink that has caffeine he will drink it although caffeine triggers his seizures. [Patient DC] is unresponsive, has little connection to her surroundings as she wanders the unit, wears a helmet due to her lack of connection to herself and surroundings, and sometimes walks into other resident's rooms, whereupon she is sometimes physically attacked by other's who have little idea of the consequences of their attacks.  Quite simply the Institute is obviously inadequately caring for these three patients, at least, and Mr. Deschamps is unfamiliar with the details of all resident's conditions and care.

15.    Similarly, when Plaintiff Gonzales responded to his February 5, 2021 Notice of Contemplated Action – Dismissal, he recorded in writing his past and current complaints about the long-time staff shortages, through the undersigned's February 16, 2021 Response to Notice of Contemplated Action:

Let's face it. You don't have enough employees. And you are paying out taxpayer dollars at a massively-increased rate because you don't have enough employees. And you are further violating all known FMLA, Disability Discrimination, and Retaliation Statutes (and probably the Fair Labor Standards Act as well) because you don't have enough employees. So hire some people, don't continue down this path to financial ruin for NMBHI.

Mr. Gonzales has right to work an intermittent leave schedule (where he works only 48 hours a week) because the only accommodation and FMLA he is asking for is a limit on his overtime hours. And no one at NMBHI has sought to renegotiate that agreement with Mr. Gonzales. Instead, you have taken the direct route to financial ruin, harassing Mr. Gonzales daily about overtime above and beyond the eight hours of overtime he is giving you. Mr. Gonzales reports that at least six supervisors have asked him to work a double shift every day he has worked for NMBHI – the requesters being Michelle Manzanares, Dwayne Quintana, Robert Romero, Johnny Romero, Rosemary Quintana, and Christine Berry. And now you propose to terminate a successful, almost 19-year veteran of state service (immediately before his 20-year anniversary) because despite Mr. Gonzales' regular practice of giving you all two more hours than he is required to, you want him to work an infinite number of hours every week in order to keep his job. I know you pay Mr. Gonzales, and pay him time-and-a-half for Overtime, but in essence, you have turned your employees into slaves, commanding them to work consistent overtime of apparently 20 hours a week or more in order to maintain their employment status. **This is all during a pandemic which is known to spread rapidly and virulently through facilities like yours.** Mr. Gonzales has complained about the consistent requests for overtime, beyond the 8-hour per week limit, by asking his two supervisors at different times – Dwayne Quintana and Ms. Lucero – why NMBHI daily asks him to exceed his FMLA agreement for months at a time. **I, on Mr. Gonzales behalf, am stating now Mr. Gonzales is making Whistleblower Protection Act and Fraud Against Taxpayer Act complaints, and has been since he started at NMBHI. He is also specifically requesting, though his prior requests for FMLA leave also count, in this context, as Requests for a Reasonable Accommodation Negotiation related to NMBHI's apparently infinite demand for overtime hours, and Mr. Gonzales' quite reasonable and medically-necessary request that he be limited to 48 hours per week. During the negotiation, in consultation with his care provider, Mr. Gonzales will attempt to meet your scheduled needs for overtime hours.**

Both Plaintiffs were terminated immediately following the complaints made in writing to their

9

involved senior supervisors, specifically including for Plaintiff Deschamps then-Hospital

Administrator Francis Tweed, Human Resources Director Defendant Vigil, and his immediate

supervisor Defendant Gonzales.  Plaintiff Gonzales written complaint was sent to Defendant

Deputy Hospital Administrator HC Hawkins, Defendant Human Resources Director Vigil,

Defendant Nurse Administrator Lucero, and his Duty Nurse, Francesca Martinez.

16.    Both Plaintiffs provided actual notice of their tort claims to Defendants  herein

through the above specified (at Paragraphs 12 and 13 above) Letter Responses to Proposed

Termination from undersigned.  Each such Letter Response was received by Defendants several

weeks before the actual termination, giving rise to the bulk of each Plaintiff's damages.  Each

Response stated directly that the chronic understaffing of NMBHI was the specific proximate

cause of the Proposed Terminations, that each proposed termination was illegal on several stated

grounds, and that a lawsuit would be filed by each Plaintiff if their terminations were

accomplished by Defendants.  Plaintiff Deschamps' January 17, 2020 Response to Notice of

Contemplated Termination stated:

> If you continue this proceeding, and terminate Mr. DesChamps, within 30 days of
> that event, Mr. DesChamps will file in court a complaint for at least violations of
> the New Mexico Whistleblower Protection Act, related to the now well
> documented complaints of unsafe supervision of residents, made in the
> investigative interview of December 3, 2019 and today.  Each of you, the Facility
> and Mr. Garcia will be material witnesses, and perhaps, named defendants if other
> claims are added.  If you discontinue this proceeding and later terminate Mr.
> DesChamps for some unrelated, unsubstantiated behavior, Mr. DesChamps will
> do the same.  Please reconsider your chosen course.

17.    Plaintiff Gonzales' February 16, 2021 Response to Notice of Contemplated Action

stated:

**Please do not carry out your intended plan to terminate Mr. Gonzales in violation of his clear legal rights. Mr. Gonzales is a long-time employee, wants to successfully serve NMBHI and retire to what he has earned through decades of hard work. Please expect Mr. Gonzales to file suit with all the pled claims outlined above. Mr. Gonzales will be asking any future jury to significantly compensate him for enduring the illegal practices identified above to protect other faithful NMBHI workers, as well as the taxpayers of this State.**

18.    Thus, with regards to each termination, the Defendants had notice of the substantial likelihood of a lawsuit directed at the Defendants a few weeks before the actual terminations, and made the decision to terminate the two Plaintiffs with actual notice that the Plaintiffs would file lawsuit based on that specific occurrence. Nothing more is required for Tort Claims Notice:

> B. No suit or action for which immunity has been waived under the Tort Claims Act shall be maintained and no court shall have jurisdiction to consider any suit or action against the state or any local public body unless notice has been given as required by this section, or *unless the governmental entity had actual notice of the occurrence*. The time for giving notice does not include the time, not exceeding ninety days, during which the injured person is incapacitated from giving the notice by reason of injury.

> NMSA Section 41-4-16 (B).

19.    The common issue then in both cases is the long-term danger to Defendant DOH's patients, employees, and taxpayers presented by Defendant DOH's on-going and regular failure to maintain adequate staffing at the facility as a whole, and its abandonment of the typical employer practice of making new hires to cover the shifts of exiting employees. The dangerous condition for patients is exemplified herein by the patient killed in November, 2019, by the universal administrative and operational failure of Defendant DOH in the day to day care of its

psychiatric patients, and the near-infinite operational problems caused by staffing units necessitating (in Plaintiff Deschamps'case) a roster of 12 to 15 Psych Techs with skeleton staffs of five to seven Psych Techs per unit (each unit housing something like 30 patients), or (in Mr. . Gonzales' case) a roster of five employees and two supervisors with a skeleton staff of two Psych Techs and one supervisor (with a unit housing something like 15 patients). The danger to employees is exemplified by the two terminations of the two plaintiffs who amplified their previous complaints about the long-term, established dangerous condition precisely because the long-term dangerous condition was now endangering their on-going employment.

20.    At all times relevant to the Complaint, each Plaintiff was a tenured employee of the Defendant DOH, supervised by the other Defendants. 1 NMAC 7.2.8; NMSA 10-9-13 (E). Each Plaintiff had worked continuously for the Defendants for 15 years or more at the time of their terminations. That tenured employment gave both Plaintiffs property interests in their on-going employment, and the Defendants were obligated by the United States Constitution and the Defendants' own policies to provide procedural due process including notice and an opportunity to be heard both before and after any government Defendants' taking of Plaintiffs' interests in their current positions and continuing employment.

### Factual Allegations Related to Tim Deschamps' Claims

21.    As established by the termination documents, Plaintiff Deschamps was terminated related to the death of the patient killed in November, 2019 (as the patient rolled unannounced into a room where Plaintiff Deschamps was setting up supervised snacks for other patients while Plaintiff Deschamps briefly answered a work-transportation phone call outside when the patient

12

choked to death by stuffing in excess of seven handfuls of Vanilla Wafer cookies into his mouth in four minutes, despite being unable to swallow the cookies).  Plaintiff Deschamps was unaware of the immediate issue because of the seven minute phone call, and was unaware that the now-deceased patient had been transferred from the Juniper Unit to the Ponderosa Unit (the day before), whereupon the Ponderosa Unit refused the patient (because they did not have the staff to care for him), sending him back from to the Ponderosa Unit into the Juniper Unit (the night before), where Plaintiff Deschamps' worked as a Recreational Therapist.

22.    Plaintiff Deschamps had no notice that the patient was on the unit, no notice that the patient was experiencing behavioral issues in Juniper, and the room where the patient died (and where Plaintiff Deschamps was working) was approximately 100 yards or more down the winding hallways from the patient's room.  The patient was transferred back from the Ponderosa Unit because the Ponderosa Unit, suffering from a similar lack of employees, had stated they were unable to safely care for the patient.

23.    In contrast to Plaintiff Deschamps' completely unknowing behavior, Defendant DOH killed the patient because RN Sharon Singletary-Mares knew that the deceased was in crisis at the time of his death, and called for assistance – for a Level Two – at 9:30 am, precisely the time the deceased took his first bite of cookies.  She was reporting that the deceased was off his medications, because the medication order had not been transferred with the deceased the night before, and knew he had "increased aggression and anxiety," was fully mobile within the Juniper Unit, and "difficult to redirect."

24.    RN Singletary-Mares' phone call was undoubtedly produced by an incident with the

deceased prior to the phone call, and RN Singletary-Mares made the unfortunate decision to

place the administrative call before she secured the deceased.  Because RN Singletary-Mares had

notice that the deceased was in crisis, she could have done a number of things to protect herself,

the Facility, Mr. Deschamps, and, of course, the deceased from future harm:

a)    Like following the deceased around in his wheelchair to keep them both safe, if he was too
agitated to be corralled, while placing the call on her cell;

b)    Like hitting the Unit Alarm to alert staff that there was an incident in progress (which
would have returned Mr. Deschamps from the patio);

c)    Like vocally calling out to some other employee to follow the deceased; or

d)    By holding on to the deceased's wheelchair with one outstretched hand so he could not
find or reach attractive dangers, or injure her.

        25.    What RN Singletary-Mares could not do in her circumstance would be make a phone

call to solve the problem of long-term care for the deceased, while the deceased – alone, agitated

and aggressively travelling as far and fast as he could -- searched for unfortunately attractive

"dangers," like a bag of Vanilla Wafers.  And all of that ignores how easy it would have been for

the Facility to:

a)    Have the deceased on Level One to start, as he had been until some months before the
death.  The deceased's condition had not changed, as he was a schizophrenic post-stroke, who
because of the stroke had a partially-paralyzed throat, and low impulse control;

b)    Have the deceased's medication orders transferred with the deceased;

c)    Have the deceased on Level One because of his night-before transfer (from Ponderosa to
Juniper) status as required by Defendants' policies;

d)    If Level One was "impossible" to staff, the deceased could have been placed in bed and
immobilized, potentially -- given his paralysis -- by simply placing the hospital bed rails up (and

psychiatric hospitals have many less pleasant ways to immobilize patients);

e)    If Level One was "impossible" to staff, the deceased could have been locked in his room; or

f)    If Level One was "impossible" to staff, and the deceased became agitated when locked in his room, his wheelchair could have been leashed to the door so he could only travel freely within his room, and 20 feet up and down the corridor.

26.    There is no policy at the NMBHI which prohibits leaving a plastic bag of Vanilla Wafers, on any other food unattended for a period of eight minutes.  Food is regularly left unattended throughout the facility by residents and employees alike.  There is a policy in place that prohibits taking personal phone calls for more than five minutes, and Mr. Deschamps honored that policy in spirit by ending the phone call in less than eight minutes, probably within 7 ½ minutes given the walk back inside. Both Plaintiffs report that in their total of 30 years at the facility, no other employee has ever been disciplined for similar phone usage, or leaving food unattended.

27.    The State Personnel Board rules command that discipline be progressive when possible, and nothing Mr. Deschamps did here caused the deceased's death.  And nothing that Mr. Deschamps did here was negligent in any foreseeable way.  He was doing his job.  He received an important phone call, necessary for his job, and he handled it in eight minutes.  He, unlike RN Singletary-Mares, had no notice that the deceased was wandering the hallways in an agitated, unpredictable state because of the medication failure when the patient should have been in his room with personal, wholly-dedicated supervision at the time of the injury.

28.    At the time of his termination Deschamps was a 15-year veteran of NMBHI.  While

15

Plaintiff Deschamps has been disciplined before by the Facility, he had no on-going discipline problems at the time of the termination, and his discipline history was not a factor in the termination, as it was not cited in the termination documents.

29.    Further, the termination was the consequence of the bad-faith investigation of the patient's death, conducted by the Facility.  The bad faith of the investigation is apparent on the face of the investigative report, as the report only investigated the final moments of the patient's life (involving Plaintiff Deschamps' innocent behavior in taking the phone call, as well as the patient's low impulse control while eating the cookies), refusing to address primary concerns such as the patient's behavior prior to RN Singletary-Mares' phone call; the failure to provide medications to the patient on the morning of November 23, 2019; the long-term decision to take the patient off of a Level One; the short-term decision not to have the patient on a required Level One on the day of  his death due to his night-before transfer into the Juniper Unit; or why RN Singletary-Mares did not immediately secure the patient's welfare, by any means necessary, rather than calling Administration to request assistance.

30.    The investigative report did not address the operational and safety failures of the Facility caused by the habitual under-staffing of the Units.  The investigative report also failed to address the safety failure presented by the Juniper Unit's failure to have operational resuscitation equipment in the Juniper Unit, a direct violation of policy as the resuscitation equipment is supposed to be inspected every single morning by Unit Supervisors.  Finally, the investigative report did not address the situation where the Ponderosa Unit would not accept the transferred patient from the Juniper Unit precisely because the Ponderosa Unit knew it could not adequately

16

care for the patient.

31.    Everything about the deceased patient's condition and care changed at some point during 2018, to the best of Plaintiff Deschamps' knowledge, when the patient had a stroke. Following the stroke, the patient was initially put on a Level One within the Juniper Unit, but that restriction was lifted allegedly because the patient would attack his attendants.  Rather than being an appropriate reason for lifting the Level One restriction, the patient's tendency to attack his attendants is a reason for raising the patient from a Level One to a Level Two or Three, or for making some other arrangement securing the patient's on-going health and welfare.  Post-stroke the patient, like many stroke victims, lost most or all of his impulse control, and also apparently suffered paralysis of one side of his throat or the other.  Thus, he became a huge risk for choking, as his unsupervised tendency would be to take anything he regarded as food and eat it rapidly, and continue to eat it rapidly (despite his resulting choke response) until all of the food was gone. If he choked in the meantime, the patient would continue eating, and he was completely unable to moderate anything about this pattern because of his loss of impulse control.

32.    At the same time, and despite the fact that he was rendered wheelchair bound by the stroke, the patient's continuing restlessness left him continually mobile – rolling around the corridors of the Juniper Unit, like it was his job, looking for something, almost anything, to stuff into his mouth.  As a consequence of this behavioral change, the patient had had two similar choking incidents, one requiring resuscitation, on November 20 and November 10, 2019 – and 30 fall incidents, five accident incidents, three patient versus patient assault incidents, and one patient versus staff assault incident in the six months before his death.

33.    Though Plaintiff Deschamps was not provided a copy of the video record of the occurrence, his Notice of Contemplated Action records that Mr. Deschamps' ate 5 handfuls of Nilla Vanilla Wafer cookies within 2 minutes and 10 seconds of spotting them, and within 52 seconds of starting to eat had over-filled his mouth to the extent where his cheeks were bulging. The fact that he had already completely over-filled his mouth did not stop or dissuade the patient at all, as he ate 3 more handfuls of cookies during the next 78 seconds.  Within 4 minutes of starting to eat, the patient attempted to ingest over seven handfuls of cookies.  Less than 4 minutes and 30 seconds after beginning to eat, the patient showed visible signs of his struggle for air, for life.  Forty-five seconds later, completely unable to breathe, the patient passed out and slumped over in his chair, never to be revived.

34.    Plaintiff Deschamps' February 3, 2020 Notice of Final Action Dismissal claims that Plaintiff Deschamps' did not respond orally or in writing following his January 9, 2020 receipt of the Notice of Contemplated Dismissal.  Nevertheless, the undersigned responded fully to the Notice of Contemplated Dismissal timely on January 17, 2020 by emailing a copy of the Plaintiff's Response to the email addresses of the then-Hospital Administrator at Frances.Tweed@state.nm.us, NMBHI's Human Resources Director at Richard.Vigil@state.nm.us, Mr. Deschamps immediate supervisor at Jeremy.Gonzales@state.nm.us and the Long-Term Care Director, Defendant Archuleta at Susie.Archuleta1@state.nm.us.  The undersigned did receive a bounce-back notice for the email to Defendant Archuleta (indicating a wrong address), but received a response from the Hospital Administrator's email address to his January 17 email, stating that she was on leave in advance

18

of the Martin Luther King, Jr. holiday, but would return on January 21, 2020.

35.    The knowing and intentional failure of NMBHI to acknowledge or address Plaintiff Deschamps' Response to Contemplated Termination, represents a knowing failure to provide constitutionally-required due process rights to Plaintiff Deschamps.  The failure is addressed herein by a formal claim of breach of contract and as a violation of required procedural due process, as Mr. Deschamps had no chance to remedy that claim precisely because NMBHI refused to acknowledge the receipt of the emails to Ms. Tweed, Mr. Vigil, and Mr. Gonzales.  It is also significant that this deception was carried out by only Senior Supervisors of NMBHI.

**Factual Allegations Related to Henry Gonzales' Claims**

36.    The Defendants fired Plaintiff Gonzales from his long-term position with the Defendant DOH on or about February 23, 2021.  At the time, Plaintiff Gonzales was a long-term tenured employee of the Defendants.  The stated reason for Plaintiff Gonzales' termination was that he had "failed to work a mandated overtime shift and been Absent without Leave (AWOL) four (4) times within a 12-month period."

37.    Like Plaintiff Deschamps situation -- where the Defendants have knowingly blamed Mr. Deschamps for killing a patient -- a point which Mr. Deschamps compellingly established during a government investigation into the patient's cause of death by stating that the deceased patient should have been on a Level One, and would have been on a Level One, but for the Defendants' insistence on chronically under-staffing NMBHI – Defendants are simply blaming Plaintiff Gonzales for their own mistakes.  Put simply, an epidemic of under-staffing at NMBHI has severely compromised NMBHI as a health institution by:

19

a)      Keeping workers regularly working 60 or 70 hours a week for months, even years (under threat of termination) when a Psych Tech's job requires them to be awake and alert and ready to deal with patient crises;

b)      Compromising patient care and safety day-in and day-out because of the unfilled shifts and tired workers despite such patently-inadequate care resulting in regular violations of patient privacy, patient comfort, patient risk of physical injury, patient risk of further emotional damage, up and to the point of patient death;

c)      Rather than taking responsibility for their mistakes, Defendants have perpetuated the problem by damaging employees' rights, health, safety, and government careers by attempting to enforce Defendants patently illegal practices, up and to the point of possible employee deaths and actual employee terminations; and

d)      Are, apparently, planning to continue this practice to the detriment of all concerned except for NMBHI's supervisors, who refuse to deal with an issue they create for themselves, by repeatedly and illegally firing long-term, fully-qualified, experienced employees like both Plaintiffs here.

38.    In Plaintiff Gonzales' situation the Defendants knowingly and with malicious intent,

and in reckless disregard of Plaintiff Gonzales' legally-established rights terminated Plaintiff

Gonzales illegally and without good and just cause by:

i)      Without notice or due process, demoting Plaintiff Gonzales from a supervisory position into a patient care position when transferring him into the Admissions section of NMBHI without good or just cause or any attempt to provide constitutionally-required due process;

ii)     Ignoring the fact that Plaintiff Gonzales was on long-time intermittent FMLA related to his 2018 left knee surgery when doing so, and unable to meet the illegal demands of Defendants for regular, though completely unscheduled, overtime in excess of 20 to 30 hours additional work per week;

iii)    Failing to provide any notice to Plaintiff Gonzales of his FMLA leave usage at any time, prior to a day before he allegedly "ran out" of FMLA leave, and knowingly failing to ensure Plaintiff Gonzales received any such notice prior to personally announcing his potential termination to him;

iv)     Falsely and inaccurately calculating his FMLA usage, and his use of sick and

20

vacation leave, pursuant his repeated requests to cover his overtime shifts by using FMLA leave;

v)    Failing to ever document to Plaintiff Gonzales' his FMLA usage, and failing to provide such documentation of calculations after the undersigned's explicit demand for such documentation;

vi)    Illegally requiring Plaintiff Gonzales to repeatedly apply for FMLA arrangements, when intermittent FMLA leave had always been renewed annually;

vii)    Failing to treat Plaintiff Gonzales', and his doctor's repeated implicit and legally-cognizable requests for reasonable accommodation as requests for legally-required reasonable accommodation negotiations, attempting to accommodate Plaintiff Gonzales' knee condition;

viii)    Ignoring the undersigned's and Plaintiff Gonzales' explicit request for a legally-required reasonable accommodation negotiation in lieu of terminating Plaintiff Gonzales;

ix)    Retaliating against Plaintiff Gonzales for his and his representatives regularly complaining regarding all of the above illegal conditions, actions, and practices in the operation of NMBHI, and directly opposing all of the above conditions, actions and practices;

x)    And in other means and manners to be identified though the discovery process herein.

39.    Plaintiff Gonzales is and was a person with a disability and serious medical condition.  He is currently four years post-knee-surgery, and has only walked with a brace since the surgery.  The left knee, which was operated on, causes Plaintiff Gonzales considerable pain, and is prone to flare-ups when overworked.  Further the involved brace and knee pain has also caused considerable left heel pain.

40.    That said, Plaintiff Gonzales is able to work full-time, and even 8 or more hours of overtime during a work week without unendurable symptomology.  When over-worked however, the knee swells and aches, his heel aches, and he has no choice (given the physical nature of his

2020 job) but to take time off to rest the leg and recover full, less painful mobility.  The left leg

of Plaintiff Gonzales, then, presents major limitations on his major life activities of walking,

standing, lifting, working and the like.

41.    His doctor repeatedly and in writing explained this to a series of NMBHI

supervisors, pursuant Plaintiff Gonzales' October 6, 2020 and January 27, 2021 FMLA-required

"*Certificate of Serious Medical Conditions*:"

> Is the employee unable to perform any of his/her job functions because of the
> condition?        *Yes.*
>
> If so, identify the job functions the employee is unable to perform?        *Can not
> perform extended work hours requirements.*
>
> Describe any other relevant medical facts, if any, related to the condition for
> which the employee seeks leave(such medical facts may include symptoms,
> diagnosis, or any regimen of continuing treatment such as the use of specialized
> equipment).        *Left knee chronic pain with patellofemoral degenerative changes
> with exacerbation of pain with stress on the knee from prolonged weight bearing
> now with left heel pain attribual to brace on the knee, limping, and prolonged
> weight bearing favoring the knee.  Can not work no more than 48 hours a week.*
>
> FMLA-required "*Certificates of Serious Medical Conditions*," at page 2, signed
> by Dr. Frank Gallegos of Buena Salud Family Medicine at page 4 (Form WH-180
> F questions in plain type, Doctor's answers italicized).

42.    Plaintiff Gonzales first heard that he might be terminated on January 6, 2021

when he was told by his supervisor Dwayne Quintana that he would exceed his 12-weeks of

FMLA leave that night (when Plaintiff Gonzales was told in November 2020 by Defendant

Human Resources FMLA Coordinator Kimberly Villanueva that his FMLA would last until

April, 2021).   Plaintiff Gonzales received the attached "Notice of Contemplated Action –

Dismissal" on February 5, 2021.

22

43.    The undersigned responded in writing -- as Mr. Gonzales' Pre-Termination

Hearing -- on February 16, 2021, and within that Letter/Response gave DOH and NMBHI full-

written notice of both the factual basis for, and the firm legal grounding of his then-potential

claims of New Mexico Human Rights Act and Americans with Disabilities discrimination (based

on his anticipated termination, the Defendants' failure to respond to his and his doctor's requests

for accommodation of his disability, and the Defendants' interference with his FMLA rights), as

well as his FMLA interference and retaliation claims, and New Mexico Whistleblower's

Protection Act claims if his termination became final.

44.    A week later Plaintiff Gonzales received the "Notice of Final Action – Dismissal"

on February 23, 2001.  Given the doctor's requests and the undersigned's Response to

Contemplated Termination – which explicitly pointed out that Defendants had never provided

Plaintiff Gonzales with on-going notice of his FMLA rights, that Plaintiiff Gonzales had a prior

long-standing intermittent FMLA Agreement in place, and that the FMLA Certificates of Serious

Health Condition were always requests for Reasonable Accommodation -- the Defendants cannot

credibly plead ignorance of his complaints or their firm factual and legal bases, and could not

have credibly investigated Plaintiff's claims within the intervening week, and thus, this matter

has become official solely because Defendant DOH wanted to punish Plaintiff for having a

disability and raising that fact in the workplace, rather than even attempt to help him as the above

specified statutes require.

45.    This was actually in stark contrast to how the Defendants had acted in the past.

Plaintiff Gonzales was transferred from the Arches, a long-term residence facility within the

NMBHI complex which closed at that time, starting to work in the Tesuque Admissions Unit on or about July 1, 2020. When working at the Arches, Plaintiff Gonzales was working as the Psych Tech Supervisor and worked as the co-supervisor (with a Nurse) of the Arches Unit for approximately five years, including at the time of his January, 2018 knee surgery.

46.    During that time, he was initially on FMLA leave for the surgery and his period of recovery, and that FMLA arrangement was changed thereafter, by Defendant Villanueva, to so-called intermittent FMLA to allow Plaintiff Gonzales leave to attend on-going medical appointments, and rest and recover when flare-ups occurred.  Indeed because Plaintiff Gonzales was an established supervisor with five years in that position, his work as a Psych Tech Supervisor was largely sedentary as he basically administered the Arches Unit and Arches staff. Consequently, prior to July 1, 2020, when he started to work after the transfer (the Arches Unit was discontinued at that time), Plaintiff Gonzales does not remember using any of his standing FMLA leave during the 2020 calendar year.

47.    At some point, late in the month of June, 2020, Defendant Hawkins (who Plaintiff Gonzales had never spoken to before) called Plaintiff Gonzales and told him the Arches Unit was being shut down, and he was being transferred to the Tesuque Unit.  Plaintiff Gonzales, who has consistent low-level pain, became concerned during the conversation about the transfer because he knew from past experience that the Tesuque Unit was more physical than his prior work supervising Arches.  He told Defendant Hawkins of that concern, and pointed out that he had had knee surgery in 2018, and was currently and for two-and-a-half years previous, been on intermittent FMLA leave related to the surgery.

24

48.     Defendant Hawkins told him to get with Defendant Villanueva when he started working at Tesuque to address his FMLA concerns.  At no time during the conversation did Defendant Hawkins indicate that Plaintiff Gonzales was going to be working as a straight Psych Tech at Tesuque (not supervising at all, but providing patient care).  In fact, Plaintiff Gonzales was never told by anyone at NMBHI that the transfer was a demotion, but both his subsequent three-day suspension and termination notices do not identify him as working in his previous position, Psych Tech Supervisor, but instead reflect a substantial demotion, back to Psych Tech Advanced – the position Plaintiff Gonzales had been promoted from years before when he assumed supervisory duties at Arches.

49.     Because Plaintiff Gonzales did not realize and was not given any notice of the demotion, the transfer which Defendant Hawkins stated would cause no issues for Plaintiff Gonzales resulted in a long string of actions -- representing breaches of contract, interference and retaliation pursuant the FMLA statute, violations of constitutional due process and systemic discrimination – all of which culminated in the Defendants terminating his employment a little more than six months after the transfer.

50.     While the never-acknowledged demotion by Defendants did not change Plaintiff Gonzales' pay – it both directly caused Plaintiff Gonzales termination (as his job duties went from sedentary and occasionally helping out when the Psych Techs were over-worked), and may have helped Defendants' terminate him as his Position Description and the resulting job duties changed, reflecting the work Plaintiff Gonzales actually did at Tesuque.

51.     Nevertheless, because Plaintiff Gonzales was talking to the Deputy Hospital

Administrator, Defendant Hawkins, communicated to him about Gonzales' inability to work long hours, and asked him for help to ensure his job despite the proposed transfer's difficulties for him, Mr. Hawkins should have told Plaintiff Gonzales that he had requested a reasonable accommodation of my left knee condition, and that a reasonable accommodation negotiation needed to occur at that time.  *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171-72 (10th Cir. 1999) (*en banc*).  Defendant Hawkins should have known that because prior to being Deputy Hospital Administrator he was NMBHI's Human Resources Director.

52.    Plaintiff Gonzales made approximately 100 or so such statements/requests of his supervisors during his time at the Tesuque Unit, as he made them everytime he was "required" to work mandatory overtime, and such requests were made to him, regularly, four days a week.

53.    Plaintiff Gonzales started his new job at the Tesuque I Unit on or about July 1, 2020, and immediately knew he was working as a Psych Tech, as he was given no supervisory responsibilities though he specifically asked about this.  Further, though he was regularly scheduled to work the AM shift of 7 to 4, and that was the only shift specifically assigned to him, the supervisors in the Unit came to him four afternoons a week, like clockwork, and directly requested that he stay over for the evening shift, meaning he was asked to work sixteen hours or more each week that he worked at Tesuque I.

54.    In fact, Plaintiff Gonzales worked 16 hours or more in a single day on July 9, 2020; August 5, 6, and 14, 2020; November 3,and 24, 2020; December 1, 2020; and January 15, 19, and 26, 2021.  That's ten times in six months, or almost twice a month.  Plaintiff Gonzales did not know it at the time, but it is actually a criminal offense for any New Mexico employee to be

26

required to work more than 16 hours in a single day, though the State has an exemption from the

provisions of the act:

50-4-30. Daily maximum hours of employment; exceptions.

**A.** No employee other than a fireman, law enforcement officer or farm or ranch hand whose duties require them to work longer hours, or employees primarily in a stand-by position, shall be required to work for any employer within the state more than sixteen hours in any one day of twenty-four hours except in emergency situations.

**B.** Any person violating any of the provisions of this act [this section] shall be guilty of a misdemeanor.

NMSA § 50-4-30.

His supervisors, including the specifically named Defendants, clearly violated that criminal and

civil statute each of the above-mentioned days, excepting the exemption.

55.    Further, every time he refused to work what his supervisors consistently called

"mandatory" overtime, he told the involved supervisor the same thing though sometimes in

different words – "I can't work that late.  I have FMLA.  I can't work that long with my knee.

You need to find someone else."  Elsewhere the statue makes plain that discharging anyone for

their refusal to work more than 16 hours is illegal too:

50-4-26.1. Retaliation prohibited.

It is a violation of the Minimum Wage Act [Chapter 50, Article 4 NMSA 1978] for an employer or any other person to discharge, demote, deny promotion to or in any other way discriminate against a person in the terms or conditions of employment in retaliation for the person asserting a claim or right pursuant to the Minimum Wage Act or assisting another person to do so or for informing another person about employment rights or other rights provided by law.

NMSA § 50-4-26.1.

56.    Plaintiff Gonzales initially refused what he thought were offered, not commanded, shifts, meaning on July 1 and 2.  Immediately following the July 4 holiday, Plaintiff Gonzales tried to comply with the repeated requests, believing if he tried to work some of their shifts, his supervisors would be happier with him and they could figure out a regular schedule that he could work.  His regular work week was Tuesday through Saturday.

57.    That next week, July 7 through July 10, he worked more than 44 hours in the first four days, an average of 11 hours a day, and his leg acted up from the over use.  He called in sick for Saturday.  The next week, July 14 through 18, he tried again to comply fully with their requests.  He worked some 59 hours.  The next week he worked the first three days, July 21 to July 23, and already had over 35 hours, his knee swelled up and he could not walk on it, so he took the next six work days off  -- July 24 through July 31.  Put simply, attempting to comply with his supervisors' demands -- and the fact that this looked to be the rest of his work-life -- broke Plaintiff Gonzales down physically and emotionally.

58.    The ten day period starting on Tuesday, July 14 and ending on Thursday, July 23, Plaintiff Gonzales worked 95 hours with his regular two days off.  For the days he worked during this ten day period, he worked an average of 12 hours per day.  Put simply, during his first month at Tesuque I, he worked 141 hours in 14 actual work days, and took 6 work days off to recover.  If he had simply been allowed to work his 8 hours a day, he could have continued without taking any of his accrued vacation days, but there was simply nothing Plaintiff Gonzales could do that would allow him to work as many hours as the Defendants wanted.

59.    This is what happens when Plaintiff Gonzales over-uses his knee.  It swells, becomes

difficult to bend at all, and becomes painful if he puts any weight on it.  Further, his doctor says

repeatedly injuring the knee further – through over-use – makes Plaintiff Gonzales' long-term

situation worse as well because it accelerates the degenerative process.  Thus, his first trip to

Human Resources for his new position was on Friday, July 10.

60.    At that time, he spoke with Defendant Villanueva and told her everything he knew

about the issue up and until that point – meaning precisely that he told her he could not work the

hours he was being asked to work;  that the amount of hours he was supposed to work was

significantly above 40 hours a week;  that he had standing orders from his doctor not to over-

stress the knee, because it goes from bad to worse to complete immobility with significant

overwork, and that he was going to need to have his standing intermittent FMLA agreement from

Arches, carried over to the job at Tesuque I.

61.    As stated above, Defendant Villanueva had previously set him up for FMLA several

times (on an annual basis) before related to the Arches job.  In July, 2020 Defendant Villanueva

wrote on his FMLA application that he was eligible for FMLA, required Plaintiff Gonzales to get

a supporting form filled out by my doctor,  but also stated that Plaintiff Gonzales could use his

accrued leave balances to address his need for time off until he secured the doctor's form.  As the

Form states (as typed in by Defendant Villanueva) "YOU ARE ELIGIBLE TO USE YOUR

ACCRUED LEAVE BALANCES WHILE YOU ATTEND TO YOUR MEDICAL CONDITION

COMMENCING ON 7/14/2020."

62.    This was Plaintiff Gonzales' second request, as well, for reasonable accommodation

from NMBHI as he told Ms. Villanueva (just as he told HC Hawkins in late June, before he knew

he would be demoted and requested to work 72 hours every week) that he could not work the

overtime Tesuque I was requiring from him, and that he needed management help to meet those

requirements.

63.    Shortly thereafter, Plaintiff Gonzales approached then Admissions Director Christine

Berry in her office, and told Berry the same thing, complaining explicitly at that time about his

Psych Tech (and not Psych Tech Supervisor) duties.  She told Plaintiff Gonzales the supervisor

position didn't matter, saying "Everybody is a Tech here," even though that was false.  Her

solution to his problems was equally unhelpful, she told him he would have to arrange his own

coverage for the additional hours, meaning he was now responsible for finding coverage for

shifts that her own managers never even scheduled.  There was no schedule everyone could look

at.  But Plaintiff Gonzales' regular shift was 7 to 4.  And he was never told by any supervisor that

he was scheduled for 4 to 11 as well.

64.    The Tesuque I managers could not schedule the Unit's full shifts, and now Plaintiff

Gonzales was being required to do their supervisor jobs for them (by arranging coverage for

shifts he was never assigned), even though he had been improperly and secretly demoted to

Psych Tech Advanced.

65.    Plaintiff Gonzales's complaints to Defendants Hawkins, Villanueva and Nurse

Administrator Berry -- who in October, 2020 was replaced by Defendant Lucero – represented

three requests for Reasonable Accommodation of his left leg disability within the first month of

working at Tesuque I in addition to his complaints to supervisors every time he was asked to

work excessive overtime.  At no time did any of the supervisors acknowledge that the requests

30

had been made

66.    Here, meaning in the aftermath of his July 10, 2020 meeting with Ms. Villanueva, Plaintiff Gonzales made a mistake.  Because as stated above, he was already emotionally stressed by the change of jobs, the change of work responsibilities, management's repeated requests for overtime, and his on-going troubles with his knee and meeting his supervisors' requests for more overtime, he did not immediately get the FMLA Certificate of Serious Health Condition form filled out.  The pandemic made this harder as well.  Plaintiff Gonzales fully admits he felt overwhelmed, and rather than acting to secure the Certificate (which did not need to be requested as Plaintiff Gonzales had already supplied the Defendants with other such forms previously in April, 2020) he ignored the issue.  That failure (which continued from July 10 through October 13) is what led to his five-day suspension from work (which Plaintiff Gonzales served starting on November 14), the first discipline action taken by Defendants against Plaintiff Gonzales during his employment, in late October to early November, 2020.

67.    There was another reason Plaintiff Gonzales did not immediately get the form filled out and signed by Dr. Gallegos who had been treating him for his knee since the surgery in 2018. Ms. Villanueva's instructions made it easy for Plaintiff Gonzales to refuse the repeated requests for overtime work by using his intermittent FMLA leave (which was actually not in place), and he supposes (because none of the Defendants have ever documented his leave usage during 2020) for his supervisors to use his vast reserves of accumulated leave from his 16 years with NMBHI.  Plaintiff Gonzales always had good attendance, and he rarely took a vacation for those 16 years.

68.    Plaintiff Gonzales does not know what happened, but believes that whenever he was asked for overtime work by his supervisors and refused to work the overtime that the supervisors took some of his accrued vacation to make up for his lack of FMLA Leave.  Nevertheless, his time records do not record that as happening, and he never received any notice from his supervisors that they were taking his accumulated leave to pay for the times he refused to work a double shift.  Indeed, Plaintiff Gonzales cannot account for how he remained working from July through September without disciplinary action before October 13, 2020 because his supervisors:

a) never told him that that happened; and

b) never seem to have docked him vacation or sick leave to make up for the requested overtime shifts.

69.    Plaintiff Gonzales knows that he refused a number of "mandatory" shifts before then, like the requested overtime on July 15 and July 21, 2020.  Nevertheless, the first time he was recorded as absent without leave was on August 21, 2020 when he worked 8 hours and 7 minutes on the day shift, and then was asked to stay until 11, and was counted as "AWOL" for 7 hours and 53 minutes.  No leave was used to cover his "absence" for the unscheduled shift, and that was the first AWOL designation he received (not that he was told that at the time because he was not).  Plaintiff Gonzales, further, clearly had Annual Leave left in reserve because on September 1, 2 and 5, he used annual leave to get another break from the too-difficult-for-him to work schedule.

70.    Immediately following notice of the proposed suspension, Plaintiff Gonzales spoke to Defendant Villanueva, secured from Dr. Gallegos the required Certificate of Serious Medical

Condition, and turned it in.  He met with her in late October or early November by phone, and Defendant Villanueva told him his FMLA leave would last until April.  Following the notice of proposed termination in January, 2021, he again secured another Certificate of Serious Medical Condition and again turned it in.

71.     The FMLA statute gave Plaintiff Gonzales 12 work weeks of unpaid leave to use in a year, *29 USCS § 2612(a)(1)(D),* and Plaintiff Gonzales was terminated well before that FMLA leave expired.  In any case, he had no notice of how NMBHI was calculating his FMLA, and was terminated without ever having NMBHI provide him with a calculation of his mathematically impossible zero-balance of FMLA leave on January 6. 2021.  Pursuant the regulations interpreting the FMLA, *29 CFR 825.300 (d)-(e),* the employer must provide written notice of the use of FMLA every 30 days or the employer is liable for interference with the employee's FMLA rights, and all FMLA leave must be recorded in writing.

72.     The only written notice of Plaintiff's FMLA usage he received was on February 12, 2021, after he had been proposed for termination, when Plaintiff Gonzales asked Nurse Francesca Martinez for documentation of his FMLA used when at Tesuque.  She gave Plaintiff Gonzales his workplace time records at that time, and the records show his "FMLA Mandatory Overtime" at 59 hours and 40 minutes by February 12, and his "Family Medical Leave Sick" at 16 hours.  That's under 80 hours -- or less than two weeks of used FMLA leave -- during the 6 months Plaintiff Gonzales worked before his termination was proposed by NMBHI.  That was the only documentation Plaintiff Gonzales ever received of his FMLA usage throughout 2020 and 2021.

73.    The Defendants each participated in numerous, substantial FMLA violations, as well as the retaliatory harassment and termination Plaintiff Gonzales received for attempting to exercise his FMLA rights, including:

a)    Breaching the FMLA form agreement for 48 hours per week throughout his Tesuque I employment;

b)    Their unannounced demotion of Plaintiff Gonzales, through no fault of his own except the Arches unit was closed -- perhaps because its employee-power was needed elsewhere -- and he was transferred, and his prior, functioning FMLA agreement, and an implicit accommodation of his condition which pre-existed his transfer by two years was breached thereafter on a daily basis;

c)    Requesting he regularly work a 72 hour work week, despite the FMLA leave, despite the fact that there is no policy-creating "mandatory overtime," and despite the fact that those regular Overtime hours were never scheduled for him;

d)    Failing to provide him with his required FMLA designation notice;

e)    Failing to ever properly calculate his FMLA leave usage;

f)    Absolutely failing to ever provide him with any notice of his on-going use of FMLA leave, let alone, as required, every thirty days;

g)    Suspending him -- when he could not work the overtime -- for AWOL that his vacation and sick leave was contractually supposed to have covered;

h)    Teminating him because of his alleged zero-balance of FMLA, despite the fact that he had no prior notice of that zero-balance (the notice from the day before first notice of the potential termination Mr. Gonzales may have been sent an email, but Mr. Gonzales did   not have a work computer and is only barely computer literate as his supervisors knew), and the zero-balance was mathematically impossible;

i)    Refusing to put him on a set-schedule with his overtime shifts designated;

j)    By implication, threatening him with the inability to collect my rightful pension if he did not violate his doctor's long-time instructions and potentially further damage his health;

34

k)    Failing to document his performance of the FMLA agreement;

l)    Failing to notify him of any on-going violations of the FMLA agreement as they occurred;

m)    Regular daily harassment, which became pervasive, as he tried to function within a different FMLA environment than he had experienced before, intended to actively and purposefully silence any complaint about NMBHI management practices, ripening into formal discipline action; and

n)    Other violations of law as identified.

All of the above comprise interferences with his FMLA rights, and are the subject-matter of that formal claim stated below.

74.    The Americans with Disabilities Act and New Mexico Human Rights Act each require that a reasonable accommodation negotiation be held whenever an employee or his close representatives (like a wife, or doctor, or attorney) tells the employer that the employee cannot meet his job requirements because of a medical condition, and that the employee wants to keep his job. That happened more than 100 times in this case, and three times in writing came from official sources like Plaintiff Gonzales' doctor and attorney. He complained sufficiently to mandate Defendants engaging the mandatory negotiation process:

a)    In his late June conversation with Mr. Hawkins;

b)    In his July 10, 2020 conversation with Ms. Villanueva;

c)    In his July 14 to 16, 2020 conversation with Ms. Berry;

d)    In his January 6, 2021 conversation with Ms. Villanueva again; and

e)    In his conversations with his supervisors every time he refused or attempted to work an overtime shift.

35

75.    The Defendants violated Plaintiff Gonzales' disability discrimination and retaliation rights by:

a)    all the FMLA interferences outlined at Paragraph 42;

b)    their bad faith failure to enter into the accommodation negotiation process;

c)    their suspension and termination of him;

d)    their on-going daily harassment of Plaintiff Gonzales for more work than he could physically do;

e)    their failure to accommodate his established medical condition by changing the demanded hours;

f)    their failure to immediately transfer him into another job that he was qualified for which he could physically perform; and/or

g)    Other violations of law as identified.

### FIRST CAUSE OF ACTION

**Breach of Contract by Both Plaintiffs Against Defendant DOH dba NMBHI**

76.    Plaintiffs reallege and incorporate herein by reference all allegations contained in this Complaint.

77.    Plaintiffs were employed by Defendant DOH under a written, oral and/or implied contract of employment which was modified and re-enforced by certain policies, practices, assurances and other express and implied statements of Defendants.  In said contract, it was implicitly agreed that Plaintiffs would not be impeded in their job duties, and explicitly agreed that they would be terminated only for good or just cause.  Further said contract stated explicitly that should the Plaintiffs suffer serious medical conditions and were otherwise entitled to Family

Medical Leave they would not be terminated while on Family Medical Leave, and the requirements of the statute would be followed including accurate accounting for the FMLA Leave used, and that all other laws, including specifically the U. S. Constitution, and the New Mexico Minimum Wage Act would be followed.  Plaintiffs entered into said contract, *inter alia*, to secure peace of mind and financial stability, and refrained from seeking employment elsewhere in reliance thereon.

78.     At all times material hereto, Plaintiffs performed their obligations under their contract with Defendants.  Defendants breached their express and implied contractual commitments to Plaintiff Deschamps by terminating his employment without proper cause, and without following the law as set out above, and by ignoring his timely delivery of his Response to  Contemplated Termination – his entire pre-termination remedy – but requiring him to Appeal his already-accomplished termination (when he was intentionally and purposefully, and without due cause at law denied his pre-termination hearing).

79.     Further, Plaintiff Gonzales was demoted without any notice or required due process, as his demotion was never communicated to him explicitly by any person, no cause for the demotion was announced, and no right to appeal the unannounced decision was ever communicated by any person to Plaintiff Gonzales until the pendency of this lawsuit.  Any requirement of exhaustion of internal remedies is met because the Defendants violated and invalidated any due process proceedings by pre-emptively breaching due process by ignoring Plaintiff Deschamps' Pre-Termination Response, despite its timely delivery, and by Plaintiff Gonzales' not-noticed demotion.

80.     At the time the parties entered into the contract, as alleged herein above, it was known and understood, and within the reasonable contemplation of the parties, that in the event of a breach, Plaintiffs would suffer present and future loss of earnings as a foreseeable and probable result thereof.  Further it was known and understood, and within the reasonable contemplation of the parties, that in the event of a breach, Plaintiffs would suffer present and future emotional distress as a foreseeable and probable result thereof.

81.     With regard to Plaintiff Gonzales, his unannounced demotion (without cause) did not directly result in financial losses as his post-demotion pay was the same as his pre-demotion pay, but he was still deprived of the promotion he earned over decades of work without notice or a hearing of any kind, suffered emotional distress when he eventually learned of the demotion, and was deprived of an essential constitutional right without any cause or basis of any kind. Further, the demotion deprived Plaintiff Gonzales of his only ability to protect himself from the illegal hours demands of Defendants because on the Tesuque Unit, at a minimum, all supervisors, but one, were allowed to leave before the completion of the Evening Shift.  Had Plaintiff Gonzales been allowed to remain as a Psych Tech supervisor, his hours of required work would have been cut substantially, and the reasonable accommodation of having Plaintiff Gonzales work approximately 50 hours a week successfully would have been "reasonable," as opposed to the key work requirement for Psych Tech Advanced.

82.     As a direct and proximate result of Defendants' breach of the contract, Plaintiff in fact has suffered loss of wages and benefits and emotional distress, the full extent and nature of which are presently unknown to them, but exceeding the jurisdictional minimum of this Court.

38

## SECOND CAUSE OF ACTION

**42 U.S.C. Section 1983 By Both Plaintiffs Against Their Respective Individual Defendants**

**Constitutional Violations -- Breach of Procedural Due Process in Violation of Fourteenth Amendment for Each Plaintiff, Retaliation for Employee Speech in Violation of First Amendment for Each Plaintiff, and Violation of Equal Protection Clause for Plaintiff Gonzales Only.**

83.    Plaintiffs repeat and reallege by reference each and every allegation contained in this Complaint and incorporates the same herein as though fully set forth.

84.    The actions of all defendants (namely DOH and the above-named supervisors in their individual capacities) alleged herein were all taken under pretense of color of state law, but such acts were beyond the scope of their rightful jurisdiction and without authorization of law as outlined above.

85.    Each Plaintiff had a constitutionally-protected property interest in their on-going tenured employment and positions with Defendant DOH.  The individual defendants each deprived the Plaintiffs of those protected property interests by intentionally and knowingly failing to acknowledge and address or consider Plaintiff Deschamps' Response to Proposed Termination -- Plaintiff Deschamps' legally-acceptable pre-termination hearing -- and by demoting Plaintiff Gonzales at approximately the time of his transfer to the Tesuque I Unit without any notice of the demotion and without any required process at all.  The separate acts comprise violations of procedural due process, and violate the due process clause of the United States Constitution, presented by the Fifth Amendment, and applied to the States by the Fourteenth Amendment.

39

86.     Further, the actions of all Defendants alleged herein constitute unlawful

discrimination on the basis of disability, and retaliation for protected first amendment speech (for

Mr. Deschamps his testimony before the NMBHI investigator into the cause of the deceased

patient's death, and for Mr. Gonzales his 100-plus complaints of illegal overtime and requests for

less overtime -- specifically including his individual complaints, and the complaints of his doctor

and attorney on behalf of Mr. Gonzales -- in violation of the First and Fifth Amendments, and

the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and in

violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et.seq.*) and the

NMHRA.

87.     The specific actions of all individual Defendants alleged herein constitute

unlawful discrimination against Plaintiff Gonzales on the basis of disability in violation of the

Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and in violation

of the Americans with Disabilities Act.

88.     The specific actions of all Defendants alleged herein constitute a violation,

abridgement and restraint on the right to petition the Government for redress of grievances and

free speech in violation of the First Amendment of the Federal Constitution:

> Congress shall make no law respecting an establishment of religion, or prohibiting
> the free exercise thereof; or abridging the freedom of speech, or of the press; or
> the right of the people peaceably to assemble, and to petition the Government for
> a redress of grievances.

USCS Const. Amend. 1.

89.     The First Amendment is applicable to the actions of state officials through the

Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution applies to state action as well.  Infringements, like this one, of First Amendment rights, are subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest.

90.    The Individual Defendants intentionally retaliated against each Plaintiff by terminating their state employment without just cause, and with the specific intent of silencing their speech, curtailing their ability to secure a safe workplace for themselves and their patients, and deflecting blame from DOH, NMBHI and themselves to the Plaintiffs.  The accomplished terminations were more than enough to still the speech of Plaintiffs, as well as any other employee of ordinary firmness who spoke out against the long-term under-staffing of NMBHI, and the consequent effects on patient and employee safety.

91.    The actions of all Defendants alleged herein constitute violations of the right to be free of retaliation for lawful acts of free speech, specifically including claims of government discrimination, unsafe government behavior (particularly long-term habitual behavior), and illegal actions by state agencies, and are *per se* public speech because of Plaintiff Deschamps participation in a cause of death investigation and because of the public nature of the dangers described herein and the illegal behavior of the Defendants described above, and Plaintiffs' right to be free (and specifically not penalized) for seeking redress of their grievances against their government employer.

92.    Additionally because Plaintiff Gonzales claims involved his disability status, including specifically claims that his proposed termination violated the Family Medical Leave

41

Act and reasonable accommodation rights secured by plaintiff pursuant his known disability, his speech is, again, protected, *per se,* as speech on government discrimination.  The only motivating factor in the illegal, retaliatory and discriminatory terminations of Plaintiffs is their protected speech.

93.    Further, though Plaintiffs' speech was public, all such speech was internal and therefore provided no unlawful consequences toward Defendants, and presented no interference with Defendants performing their legal and appropriate governmental duties.

94.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and will continue to suffer pain and suffering, and mental anguish and emotional distress; they have incurred and will continue to incur medical expenses for treatment by health professionals, and for other incidental expenses; and they have suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.  Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

95.    Defendants' conduct as described herein was intentional, malicious and oppressive, and done with a conscious disregard of Plaintiff's rights, as well as being done as routine practice.  The acts of the Individual Defendants were performed with the knowledge of an employer's economic power over its employees, and should have been performed compliant with the Defendants' duties to act constitutionally.  Defendants, through their co-officers, managing agents and/or supervisors, authorized, condoned and ratified the unlawful conduct of all of the other Defendants in this action. Consequently, Plaintiff is entitled to punitive damages and attorney's fees from all Defendants.

42

## FOURTH CAUSE OF ACTION

### Violation of The Whistleblower Protection Act

### By Plaintiff Deschamps against Defendant DOH dba NMBHI Only

96.     Plaintiff Deschamps realleges and incorporates herein as if set forth in full by reference all allegations contained in this Complaint.

97.     NMSA 1978, §10-16C-3 provides that "a public employer shall not take any retaliatory action against a public employee because the public employee:  (A) communicates to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act, or because the public employee objects to or refuses to participate in an activity, policy or practice that constitutes an unlawful or improper act; (B) provides information to or testifies before, a public body as part of an investigation, hearing or inquiry into an unlawful or improper act; or (C) objects to or refuses to participate in an activity, policy or practice that constitutes an unlawful or improper act."

98.     The actions, refusals to act and testimony provided by Plaintiff in the course of official investigations and as internal complaints of illegal actions by DOH constitute protected whistleblower conduct within the meaning and scope of NMSA 1978, §10-16C-3(A) –(C).

99.     DOH retaliated against Plaintiff in the manner enumerated because of Plaintiff's protected whistleblower conduct within the meaning and scope of NMSA 1978, §10-16C-3(A) – (C). .

100.     As a direct and proximate result of the actions and inactions of DOH described above, Plaintiff has suffered damages, as set forth above. Pursuant to NMSA 1978, §10-16C-

4(A) , Plaintiff is entitled to actual damages, two times the amount of back pay with interest on the back pay, and compensation for special damages. They are also entitled to recover their reasonable attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for judgment against DOH, for compensatory damages, double lost wages, interest as allowed by law, and attorney's fees and costs, all in an amount to be determined at trial, plus such other and further relief as the Court deems just and proper.

## **FIFTH CAUSE OF ACTION**

### Violation of the New Mexico Human Rights Act
### Disparate Treatment, Retaliation and Hostile Work Environment Caused by Plaintiff's Disability

### By Plaintiff Gonzales Only and Against All Gonzales Defendants

101.    Plaintiffs reallege and incorporates herein by reference all allegations contained in this Complaint as if set forth in full herein.

102.    The New Mexico Human Rights Act, NMSA, 1978, Section 28-1-7, makes it an unlawful and discriminatory practice for an employer to discriminate in the terms and conditions of employment because of a person's disability status.  DOH is an employer covered by the New Mexico Human Rights Act.  Plaintiff Gonzales was an employee of DOH which directly and intentionally discriminated, retaliated and harassed him because of his disability described above and failed to provide a required reasonable accommodation negotiation to determine suitable employment discriminated against the plaintiffs in the terms and conditions of their employment.

103.    As pled above Plaintiff Gonzales was a disabled employee with a left leg impairment which limited his major life activities of standing, walking, running and working.

44

The impairment precluded Defendant Gonzales from completing all his job responsibilities, but could have been accommodated by limiting Plaintiff Gonzales' work to 50 hours a week, returning him to the supervisory position he was illegally and without good cause demoted from, or finding a replacement job for Plaintiff Gonzales.  Upon knowledge and belief, all such options were available and could have been enacted by the Gonzales' Defendants both at the time of Plaintiff Gonzales' termination, and before and after.

104.    The Defendants had a duty by law not to discriminate against plaintiff because of his disability status.

105.    Defendants breached their duty to not discriminate, harass and retaliate against Plaintiff Gonzales as described above and violated NMSA 1978, Section 28-1-7, by their aforementioned actions, inaction and omissions.

106.    Plaintiff Gonzales exercised his lawful right to complain of discrimination, the lack of a reasonable accommodation negotiation, and the lack of an available reasonable accommodation, and pursue legal recourse as guaranteed by the New Mexico Human Rights Act, N.M.S.A. 1978, §28-1-1 *et. seq.*  The New Mexico Human Rights Act, N.M.S.A. 1978, §28-1-7(I)(2) makes it an unlawful discriminatory practice for any person to "aid, abet, incite, compel or coerce the doing of any unlawful discriminatory practice or to attempt to do so," N.M. Stat. § 28-1-7 (I) (1) and for any person or employer to "engage in any form of threats, reprisal or discrimination against any person who has….filed a complaint, testified or participated in any proceeding under the Human Rights Act."  Finally, the right to a reasonable accommodation is provided at N.M.S.A. 1978, §28-1-7 (J).

107.    In violation of New Mexico Human Rights Act, N.M.S.A. 1978, §28-1-1 *et. seq*. Defendants, through their agents or supervisors engaged in unlawful retaliation. The retaliation consisted of the acts specifically alleged above.

108.    At the time of the disparate treatment discrimination, hostile work environment, and retaliation, Defendants knew it was unlawful to engage in such discrimination and retaliation and knowingly permitted its agents to do so.

109.    Plaintiff Gonzales has exhausted his administrative remedies herein by filing a New Mexico Human Rights Division Charge of Discrimination, has secured a right-to-sue letter from NMHRB applying to that Charge, and expects to shortly (in the next three months) to receive a similar letter from the Equal Employment Opportunity Commission.

110.    As a direct and proximate result of Defendants' conduct, Plaintiff Gonzales has suffered loss of earnings and benefits and economic damage and emotional distress in an amount which is presently unknown to them, and to be proved at trial, but exceeding the jurisdictional minimum of this Court.

## SIXTH CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act 1964 -- 42 U.S.C. §2000, <u>et seq</u>.**
**And Americans with Disabilities Act**
**Disparate Treatment Discrimination,**
**Failure to Negotiate Reasonable Accommodation and Hostile Work Environment**

**By Plaintiff Gonzales and Against Defendant DOH dba NMBHI only**

111.    Plaintiff realleges and incorporates herein by reference all allegations contained in this Complaint as if set forth in full herein.

112.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C., § 2000e et seq., makes it an unlawful employment practice for an employer to discriminate in employment by termination, demotion, desperate treatment, hostile work environment or retaliation against a disabled employee who complains of discrimination and/or who asserts the rights provided to them under Title VII.

113.    DOH and DOH's supervisors had a duty by law not to discriminate, retaliate or harass Plaintiff Gonzales because of his disability status.  As pled above Plaintiff Gonzales was a disabled employee with a left leg impairment which limited his major life activities of standing, walking, running and working.  The impairment precluded Defendant Gonzales from completing all his job responsibilities, but could have been accommodated by limiting Plaintiff Gonzales' work to 50 hours a week, returning him to the supervisory position he was illegally and without good cause demoted from, or finding a replacement job for Plaintiff Gonzales.

114.    The aforementioned actions of Defendant DOH constitute unlawful disability harassment, creating a pervasive hostile work environment in violation of Title VII.

115.    Defendant DOH, through its agents or supervisors engaged in unlawful retaliation in violation of Title VII, as amended.  The retaliation consisted of the acts specifically alleged above.

116.    At the time of the disparate impact and treatment discrimination, hostile work environment and retaliation, Defendants knew it was unlawful to engage in such retaliation and knowingly permitted their agents to do so.

117.    As a direct and proximate result of Defendant DOH's conduct, Plaintiff Gonzales

47

has suffered loss of earnings and benefits and economic damage and emotional distress in an amount which is presently unknown to him, and to be proved at trial, but exceeding the jurisdictional minimum of this Court.

118.    Defendant DOH's actions were intentional, willful, malicious, reckless, wanton, grossly negligent and deliberately indifferent to Plaintiff's rights and personhood, thereby entitling Plaintiff to an award of punitive damages.

### EIGHTH CAUSE OF ACTION

**FMLA Interference (29 U.S.C. Section 2615 (a))**

**By Plaintiff Gonzales against Defendant DOH dba NMBHI Only**

119.    Plaintiff repeats and realleges by reference each and every allegation contained in the Complaint and incorporates the same herein as though fully set forth.

120.    Plaintiff Gonzales was an eligible employee pursuant the FMLA, as he had worked for the Defendant NMBHI for more than 12 months continuously prior to taking FMLA, and worked more than 1250 hours during those 12 months, and Mr. Gonzales requested and received FMLA sometime in the middle of October, 2020.  Plaintiff Gonzales was both properly entitled to and received the initial grant of FMLA leave.

121.    Defendant DOH dba NMBHI employed more than 50 persons on a normal work day, NMBHI was a "public agency" pursuant FLSA, and in the case of Mr. Gonzales operated a psychiatric hospital.  Defendant interfered with Plaintiff Gonzales' repeated attempts to exercise his FMLA rights regularly and throughout his time at the Tesuque I Unit, including:

a)    Breaching the FMLA form agreement of 48 hours per week throughout his

48

Tesuque I employment by requiring, but not scheduling, him to work up to 72 hours per week;

b)    Their unannounced demotion of Plaintiff Gonzales, through no fault of his own except the Arches unit was closed -- perhaps because its employee-power was needed elsewhere -- and he was transferred, and his prior, functioning FMLA agreement, and an implicit accommodation of his condition which pre-existed his transfer by two years was breached thereafter on a daily basis;

c)    Requesting he regularly work a 72 hour work week, despite the FMLA leave, despite the fact that there is no policy-creating "mandatory overtime," and despite the fact that those regular Overtime hours were never scheduled for him;

d)    Failing to provide him with his required FMLA designation notice;

e)    Failing to ever properly calculate his FMLA leave usage;

f)    Absolutely failing to ever provide him with any notice of his on-going use of FMLA leave, let alone, as required, every thirty days;

g)    Suspending him -- when he could not work the overtime -- for AWOL that his vacation and sick leave was contractually supposed to have covered, when Plaintiff Gonzales could not be AWOL from an unscheduled shift;

h)    Terminating him because of his alleged zero-balance of FMLA, despite the fact that he had no prior notice of that zero-balance (the notice from the day before first notice of the potential termination Mr. Gonzales may have been sent an email, but Mr. Gonzales did   not have a work computer and is only barely computer literate as his supervisors knew), and the zero-balance was mathematically impossible;

i)    Refusing to put him on a set-schedule with his overtime shifts designated;

j)    By implication, threatening him with the inability to collect his rightful pension if he did not violate his doctor's long-time instructions and potentially further damage his health;

k)    Failing to document his performance of the FMLA agreement;

l)    Failing to notify him of any on-going violations of the FMLA agreement as they occurred;

m)     Regular daily harassment, which became pervasive, as he tried to function within a different FMLA environment than he had experienced before, intended to actively and purposefully silence any complaint about NMBHI management practices, ripening into formal discipline action; and

n)     Other violations of law as identified.

All of the above comprise interferences with his FMLA rights and are the subject-matter of this claim.

122.    The taking of legal FMLA leave fully or partially caused the adverse action of termination of Plaintiff Gonzales' employment by Defendant.  The Defendant made the decision to terminate Plaintiff Gonzales by creating the issue of exhausted FMLA out of thin-air (meaning without any accounting for FMLA used beyond the Tesuque I time-keeping which reflects approximately 75 hours of used FMLA leave in six months of working for Tesuque I, when the statutory limit is 480 hours).  All of the above was done under color of law, in fact, using the law regularly to justify clearly illegal behavior.

123.    Plaintiff Gonzales was damaged by the long-term interference with his FMLA rights because the interference delayed her return to work, and that delay was stressful, detrimentally impacted her compensation (as FMLA leave is unpaid) and robbed Plaintiff Cunningham of her guaranteed right to return to work, given the doctor's certification, so that she could not prove her fitness for duty.

124.    As a direct and proximate result of Defendants' long-term interference with his FMLA rights, Plaintiff Gonzales was damaged because working beyond the limits specified by his doctor (48 hours per week) physically damaged him; actions like suspending him for

fraudulent violations detrimentally affected his compensation; the repeated demands to work beyond his physical capacity and doctor's orders were stressful resulting in fits of depression during his time at Tesuque I;  the Defendant's failure to issue the legally-required Designation Notice, coupled with the failure to notify him of his on-going FMLA usage and leave balance on a regular basis left him without any awareness of the possibility of his termination following receiving his FMLA leave in October, 2020; the fraudulent announcement of his AWOL on January 6, 2021 came out of the blue causing more emotional distress, and the eventual termination, predicated on no-known calculation of his FMLA leave balance other than the 75 hours used on his time records was fraudulent as well.  Further, the undersigned's Response to Defendant's proposed termination of Plaintiff Gonzales specifically addressed these interferences, was ignored, and in doing so, Defendant knowingly confirmed the termination on wholly-fabricated, wholly-illegal grounds.

125.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer pain and suffering, and emotional distress, he has continued to incur medical expenses for treatment, and for other incidental expenses, and he has and will continue to suffer lost wages and benefits as well as other losses to be identified during discovery. Plaintiff is thereby entitled to general and compensatory damages and attorneys fees in amounts to be proven at trial.

## NINTH CAUSE OF ACTION

**FMLA Retaliation (29 U.S.C. Section 2615 (b)) Against Defendant DOH dba NMBHI**

**By Plaintiff Gonzales against Defendant DOH dba NMBHI Only**

126.    Plaintiff repeats and realleges by reference each and every allegation contained in this Complaint and incorporates the same herein as though fully set forth.

127.    The Plaintiff availed himself of a right pursuant the FMLA statute by applying for and being provided FMLA at the Tesuque I Unit during 2020.  Following his application and eventual use of the FMLA, the Defendant retaliated against Plaintiff Gonzales as indicated above.

128.    The firing of Plaintiff Gonzales and other acts of retaliation specified above were caused by the Defendant's intent to retaliate against Plaintiff Gonzales for taking FMLA leave rather than comply with his supervisor's demands that he work unscheduled shifts.  The proffered reasons for his firing could not have been true as they were fraudulent, violated the FMLA, did not warrant firing, and, therefore, were not the cause of Plaintiff's termination.

129.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer physical pain and degeneration of his knee, and emotional distress, he has continued to incur medical expenses for treatment, and for other incidental expenses, and he has continued to suffer lost wages and benefits as well as other losses to be identified during discovery.  Plaintiff is thereby entitled to general and compensatory damages and attorneys fees in amounts to be proven at trial.

## PRAYER FOR DAMAGES

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Defendants as follows:

### Definition of General and Compensatory Damages

52

When Plaintiffs use the term "general and compensatory damages" herein that term is intended to include at least the following categories of damages:

    a)      backpay;

    b)      loss of fringe benefits;

    c)      loss of future earnings and future lost benefits;

    d)      emotional distress damages;

    e)      medical and psychological expenses;

    f)      future medical and psychological expenses

    g)      loss of enjoyment of life;

    h)      pain and suffering;

    i)      loss of household services;

    j)      interest on past damages; and

    k)      any other damages which this Court deems fit and proper.

**Total Relief**

Total relief should amount to at least $500,000.00 per plaintiff.

**With Regard to Each Cause of Action:**

1.    That Plaintiffs be awarded general and compensatory damages, including prejudgment interest, in an amount according to proof at trial;

2.    That Plaintiffs be awarded punitive damages in an amount according to proof at trial;

3.    That Plaintiffs be awarded reasonable attorney's fees and costs of suit; and

4.    That Plaintiffs be awarded such other and further relief as the Court deems just and

proper.

Respectfully submitted,

  /s/George T. Geran
George Geran, Esq.
Law Office of George Geran
214-A Rabbit Road
Santa Fe, New Mexico 87508
Phone: 505-983-1085
Email: Geranlaw@aol.com

Attorney for Plaintiffs
